**William SIMMONS, to his own use and the use of The Travelers Insurance Co., a body corporate**

v.

**ORE NAVIGATION CORPORATION.**

Adm. No. 4363.

United States District Court
D. Maryland.

Feb. 6, 1963.

Marvin Braiterman and Sheldon H. Braiterman, Baltimore, Md., for libelant.

David R. Owen, Peter Parker, and Semmes, Bowen & Semmes, Baltimore, Md., for respondent.

THOMSEN, Chief Judge.

Libelant received a minor injury under circumstances creating liability because of unseaworthiness, but he has so deliberately exaggerated his symptoms as to cast doubt even on many of his original complaints.

The following facts have been found after considering the credibility of the testimony of libelant and the other witnesses in the light of all the evidence.

On August 2, 1961, libelant was working as a ship ceiler for Nacirema Stevedoring Co. in the hold of respondent's vessel, the S. S. Bethtex, which was lying off the high pier at Sparrows Point, Maryland. While he was bending over in the course of his work, a 6-ounce steel pin, 4 inches long, which had worked loose from the upper block assembly of a boom, fell about 75 feet and struck the back of his neck, causing abrasions and contusions around the 6th and 7th cervical vertebrae. He was not rendered unconscious, but dropped to his knees, told his fellow workers what had happened, was given the pin, walked off the ship, reported his injury and went to the dispensary in the yard at Sparrows Point, where he was given first aid in the form of an ice bag and medicine to ease the pain. An x-ray showed no bone injury. Subsequent x-rays have also shown no bone or disc injury.

At about 6:00 p. m., libelant drove his car to his home in Glen Burnie. Later that evening he had an hysterical episode, which he variously described as passing out or being partially paralyzed, as a result of which he went to the South Baltimore General Hospital, where he spent the night. Although he testified that his wife was present at the time of the incident, he did not call her as a witness.

Dr. Buchness, an industrial surgeon, reported the injury as "torticollis, mild sprain of cervical spine". Torticollis, otherwise known as wryneck, is an affection of the neck due to irregular contraction of the muscles, causing twisting of the neck and an unnatural position of the head. It may have an organic, physiologic or psychogenic basis. It may also be deliberately faked, with or without a previous genuine condition.

For several months after the accident libelant complained of pain in his shoulders, back and leg, and weakness in his right hand, as well as of pain in the neck and headaches. He was treated at the Central Medical Center by Dr. Fishel, who sent him on September 15 to Dr. Arnold, a capable and experienced neurologist and neurosurgeon. Dr. Arnold found that libelant presented a "very bizarre clinical picture". He said: "The constant position of the neck flexed to the right is very unusual, and I know of no physiologic basis for this. The sensory changes are in my opinion not genuine. This leads one to doubt the sincerity of patient's complaints. Further observation will be required before giving a final opinion." On passive movement a full range of motion of the neck could be obtained. Dr. Arnold recommended physiotherapy, which was given for about three months.

On September 18 libelant's lawyers sent him to Dr. Israel H. Weiner, who found that the symptoms were "not anatomically consistent"; he did not believe that they were of an organic basis; they were, in his opinion, "due to psychogenic factors". In his report of October 24, Dr. Weiner concluded: "I would not recommend any further neuro-diagnos-

tic procedures nor any operation. Psychiatric consultation could be considered."

Late in October, Dr. Arnold saw libelant again and noted that he held his head less to the right than on the previous examination. Dr. Arnold felt that there was no organic injury, but in view of the improvement with physiotherapy, he recommended that it be continued. He further recommended that "the patient should be strongly urged to go back to work, to prevent him from becoming a psychological neck invalid".

Because of continued complaints of pain, which Dr. Arnold at first believed to be sincere, he had libelant admitted to University Hospital on January 4, 1962, for a myelogram, which was reported normal, and thereafter for traction, which sometimes helps relieve neck pain. After two or three weeks, and several incidents detailed in the hospital record and in Dr. Arnold's testimony, the doctor concluded that libelant's complaints were not sincere. Dr. Arnold felt that there was nothing wrong with libelant and strongly urged him to return to work.

Libelant worked for a total of seven days in the spring of 1962. He testified that he was unable to use the tools required by his job, but I find that he had no greater difficulty than should have been expected by anyone who had done no work for six months. Libelant was very fond of fishing, having won a $25,000 prize in 1958 for catching Diamond Jim III; so, the first of June, he moved to St. Michaels, in Talbot County, where he obtained a job as a painter. Since then he has worked at that trade on the Eastern Shore and in the Washington area whenever jobs were available, and in his spare time has enjoyed life on and about the water.

In July he came to Baltimore for a pretrial deposition in this case. He held his head to one side while in the presence of the lawyers, but immediately upon leaving his lawyer, straightened up his head, ran for a cab, and looked about, turning his head both ways. This was observed by two experienced and credible investigators, who observed libelant on four separate days engaging in various activities, holding and moving his neck normally at all times. The investigators supplemented their testimony by motion pictures which confirmed the normal position and movements of the head while libelant was changing a tire, walking, driving a car, fishing, and poling a boat.

Dr. Arnold saw libelant again less than a month before trial and found no evidence of injury; he noted that libelant held his head tilted to the right, but that when his attention was diverted during the examination kept it well to the left. Dr. Arnold testified flatly that in his opinion the so-called torticollis had neither an organic, a physiologic nor psychogenic basis, but was deliberately faked.

At the trial libelant called as his witnesses two doctors, a neuropsychiatrist and an orthopedist, each of whom had examined him on three occasions and neither of whom had treated him.

The neuropsychiatrist testified that his final diagnosis was: "Head injury, with cerebral concussion as evident in a period of unconsciousness, and amnesia for events both preceding and following the injury, with post-concussion headaches, dizziness and other symptoms". He further testified that "there is also a post-traumatic neurosis, hysteria, with torticollis, as well as anxiety, depression, insomnia, anoraxia and nightmares".

Although I believe that the neuropsychiatrist is honest and capable, he was certainly gullible. Especially since he felt that libelant had a poor memory, it is remarkable that he made no effort to check the history given by libelant either with the hospital records or with the attending physicians. The history, upon which the doctor relied in forming his opinion, was wrong in many ways: there had been no blow to the back of the head, nor any other head injury; the pin weighed 6 ounces, not two or three pounds; libelant was not rendered unconscious; his memory for events preceding and following the injury was good, both on the stand and in the histories

given to the doctors who treated him; his condition is not made worse by work, as the doctor believed; indeed, libelant testified that he feels better when working. The doctor accepted uncritically libelant's false statement that his neck is twisted and all the other complaints. Moreover, libelant failed to tell the doctor that he had injured his neck the year before this accident.[1]

The credibility of the testimony of the orthopedist is destroyed by his reliance on an equally erroneous history, along with his finding that libelant's neck is tight or fixed in an unnatural position, which has been shown to be wrong by the motion pictures, by the testimony of the investigators, and by the testimony of Dr. Arnold as to what he saw during his most recent examination. Much of the testimony of the orthopedist consisted of a discussion of possible difficulties which can develop from a prolonged torticollis, of academic interest here because libelant's claimed torticollis, at least since the autumn of 1961, has been deliberately faked.

There is no evidence that proctors for libelant participated in this deception. I find that they were misled by their client.

Respondent's advocates argue that because libelant has deliberately sought to mislead the Court as well as the doctors and the lawyers with respect to his claimed disabilities, the Court should disallow any recovery in this case. They suggest that a jury would do so, and that the Court should do what a jury would do. That is not a proper guide for a decision of an admiralty judge. Libelant elected to bring this action in admiralty, rather than at law, where either side might have had a jury. He is entitled to the judge's best judgment, whether more or less favorable to him than a jury's would be.

The burden of proof is on libelant not only with respect to his original injury but also with respect to his damages. He did receive an injury, albeit not so severe as he now claims; it caused him some pain, required some treatment and prevented him from working for a time. However, he has not convinced the Court that he was disabled from working after the latter part of September 1961, when he was examined by Dr. Weiner, to whom he had been referred by his own lawyers, although it would probably have been another month before he would have been able to carry his full work load. Also in September Dr. Arnold reported his opinion that there was no organic basis for the complaints. The additional treatment was furnished to give libelant the benefit of any doubt, as Dr. Arnold testified, and to establish clearly the compensation insurance carrier's right to terminate workmen's compensation payments.[2] Respondent in the instant case should not be required to pay for the treatment after the latter part of October 1961, nor for any pain resulting from such treatment, which libelant brought on himself.

Libelant undoubtedly suffered some pain as a result of the injury, how much is hard to tell. *Falsus in uno, falsus in omnibus* is a maxim always worthy of consideration, not always to be followed. Here it applies to minimize the amount of pain which libelant can be said to have proved, not to eliminate any award.

Damages will be awarded for 13 weeks' loss of wages at $91.54 per week, a total of $1,190.02; for doctors' bills through the latter part of October 1961, in the amount of $367.50; and $500.00 for pain and suffering, a total of $2,057.-52.[3]

1. Libelant collected $500 for three weeks' disability as a result of that accident.

2. The amount of compensation paid is not a proper basis for an award of damages in this case.

3. Since it has been stipulated that Travelers paid $1,813.16 workmen's compensation and $1,242.07 medical bills, counsel will prepare a judgment order giving proper effect to Travelers' lien.